THOMAS, Justice.
The Governor and the administrative officers of the Executive Department, constituting the Board of Commissioners of State Institutions, filed a bill of complaint against D. B. Rhea, an insane person, and Albert C Mathias, his guardian, charging that the lunatic’s estate was liable for the cost of his care, 'maintenance and treatment at the Florida State Hospital at Chattahoochee, and claiming' that a judgment should be entered for the amount found due. '
The prayer was predicated on the allegations we shall now digest.
The hospital was established for the care and treatment, under the supervision of the Board as required by Sec. 17, Art. IV of the Constitution of Florida, of persons who become insane and .are committed according to law. From time to time the Board 'has fixed the amounts to be charged for these services. The .charge prevailing since 1 April 1951 is $150 quarterly. In 1940 Rhea was indicted for murder, but before he could be tried he was adjudged insane in accordance with the provisions of Sec. 203, Chapter 19554, Laws .of Florida, Acts of 1939, F.S.A, § 917.01, and committed by the court to the' State Hospital where he was., admitted about .13.January, 1941 and where he has since remained. At the time’ a guardian, .predecessor of appellee-Mathias, took charge of his property worth more than $20,000. The appellee-Rhea’s children are now married, hence no longer dependent upon him for support. His estate has appreciated considerably in the intervening years.
In sum,, there is ample money in the the guardian’s hands to defray the expenses of the ward at the hospital. We must decide whether the payment can be enforced.
The circuit judge thought it could not, so he dismissed the bill on motion.
Although the law first appearing in Chapter 3115, Laws of Florida, Acts of 1879, now' found'in Chapter 394, Florida Statutes 1951, and F.S.A., was extant, the court in Heidt v. Caldwell, Fla., 41 So.2d 303, based its opinion squarely on Sec. 5, of Chapter 4357, Laws of Florida, Acts of 1895, and held that persons financially, able to pay the costs of their care and treatment at the hospital should be required to do so and that a duty fell upon the Board to recover the cost to the State of maintaining the patient at the institution. The part of the Constitution of 1885 dealing with the subject is found in Sec. 1 of Article XIII r “Institutions for the benefit of the insane * * * -shall be fostered and supported by the State, subject -to such regulations, as may be prescribed by law.”
It-is 'important to note that, the commitment mentioned in the cited case was-made in 1923-, and that the author of the opinion was careful to point out the inapplicability of any statutes enacted by the Legislature save those in effect at the- time.. So we cannot rest our. decision on the Heidt case, supra, but must take into account later enactments.
It was expressly provided in Sec. 5 of the Act forming the basis for the decision in the Heidt case, supra, 'that except in cases where the lunatic was “insolvent and unable to pay” the expense of his maintenance at the asylum should be borne by his estate. •
The lunatic here involved was received at the hospital, as we have related in analyzing the bill, early in the year 1941, having been “committed to the Superintendent * * * to be by him kept in and confined * * * in accord with the provision of the Criminal Procedure Act of the Legislature, of the State of Florida, of the year 1939.” See Chapter 917, Florida Statutes 1951 and F.S.A.
The very Act, Chapter .4357, supra, that governed the. decision in the cited case, on which the appellants rely, - contained .the express provision that it should “not'apply to persons charged with criminal offenses and who pleads [sic] insanity.” [Emphasis added.] So it is clear that the Act by its own terms could not have applied in a case like the present one. .
The relévant-section of Chapter 4357, supra, seems to 'have remained the law of the state as late as the Compiled General Laws *569 of 1927, Sec. 3658, and until 1929 when the Legislature by Chapter 14527 repealed,: by reference to Sec. 2312 of the’Revised General Statutes 1920, all that part of Sec. 5 of the original law referring to responsibility of estates of persons non compos mentis for care in the asylum.
Although the law-making body before Rhea’s commitment dealt with the matter of fees in lunacy proceedings in Chapter 16074, Laws of Florida, Acts of 1933, and with'the general subject in Chapter .19163,' Laws of Florida, Acts of 1939; and after his committal in Chapter 20504, Laws of Florida, Acts of 1941; and Chapter 23157, Laws of Florida, Acts of 1945, none o'f these enactments prescribed a method for collecting costs of hospitalization except the sections we shall presently relate, originally enacted in Chapter 3115, supra.
At this point it is clear that the provisions held to govern 'the case of Heidt v. Caldwell, supra, have long since been abandoned and have never been revived.
To understand fully the policy of the state in respect of the care of the insane and the status of present statutes on the subject it may be well further to explore the history of constitutional and statutory law dealing with these unfortunates. The provisions of See. -1 o-f Article XIII of the Constitution of 1885 are identical with those in .Sec. 1 of Article X of the Constitution of 1868. In the' earlier there appeared, in Sec; 3, the provision that “The respective counties of the State shall provide in the manner fixed by law for.those of the inhabitants who by reason of age, infirmity, or misfortune may have claims upon the aid and sympathy of society.” In the later the samé provision is found in Sec. 3 of Article XIII.
Even before the adoption of the Constitution of 1868 the Legislature had enacted a law, Chapter 792, Laws of Florida, Acts of 1856, relating to the custody -of insane persons and providing that one adjudicated insane could be transferred to “some asylum in any other State * * . If the lunatic was destitute, the costs were to be paid from the State Treasury; if the estate of the lunatic was sufficient to me'et such costs, • the : decree disposing of the matter was -to “bind said estate.”
At the time of the adoption of the Constitution of 1868 it' was the law of the State that solvent lunatics were to pay for their custody and treatm'ent while the State wa;s to pay for the custody and treatment of those who were insolvent. ■
In 1874, by Chapter 2012, the governor was required to set aside public buildings at Chattahoochee “for the purposes of an indigent lunatic asylum, to which all indigent persons who may be found to be insane ■ * ‘ * * may be ■ confined for safe keeping and ' treatment.”'■ This Act contained no reference whatever to receiving patients who were not destitute.
The next legislation oh the'subject was Chapter 3036, Laws’ of Florida, Acts of 1877, which repealed the section’of the Act of 1856 providing for the transportation of lunatics to hospitals outside the'State and amended the section authorizing the payment from the Treasury of the cost of care and treatment of'indigent' insane person's. Under this law a destitute lunatic was required to be delivered to the State Hospital, or to some individual who would undertake to care. for him and who would receive for the service a specified amount to be paid by the .State, Treasurer. In this Act there was no mention of the care ,of lunatics who were not indigent.
-Apparently, there- was at this time 'a hiatus, because there seemed to have been no provision for the hospitalization of solvent lunatics. . So in 1879, by Chapter 3115 of the Laws of Florida, the Legislature authorized the admission at the “Asylum for Indigent Lunatics” of this class of insane persons where their friends, parents or guardians were agreeable to’ paying for care and treatment. The provisions of this Act which we will now analyze are now found in 'Chapter 394, supra.
This law provided for the reception of insane persons whose “friends, parents or guardians are able and willing to pay for [their] care, custody and maintenance * * * ”. and for the payment of the amounts fixed quarterly. The -Board was authorized by -the next section to require bond to insure reimbursement to the state.
*570 Inasmuch as we are dealing here with an incompetent person who is not destitute, no occasion arises to peruse the statutes relating to the commitment of those who are financially irresponsible, but we must take into account allied laws with reference to the commitment of persons found insane on the eve of their trial for the perpetration of crime.
As we decipher the law, a lunatic could be placed in the hospital if his friend, guardian, or parent was willing to pay for the service such sum. as was fixed by the Board and the Board could require of the friend, parent, or guardian a bond to secure “prompt and faithful”- payment of the obligation and might sue “upon said bond” to recover the ampunt of any outstanding indebtedness. All this seemed to depend upon a voluntary arrangement as a part of which the Board might request a bond, but we are not directed to any statute or authority for the recovery of the amount due for care and treatment of a patient simply because he was not. penniless.
Of course, the present action is not one brought upon a bond given as a part of such an agreement. On the contrary, the lunatic in the present case was sent to the asylum under the provisions of the Criminal Procedure Act to abide the return of sanity, in which event he will be tried for murder in the first degree. In this situation a friend, parent, or guardian could not have been in position to enter into any agreement, or arrangement, as was contemplated in the statutes just cited. ' There could have been no opportunity for any one in his behalf to negotiate for his admission as a “pay patient.”
We are aware of no authority for the action brought and, obviously, cannot undertake to supply it, judicially.
We think the chancellor was dead right in his rtiilng dismissing the bill.
In our study of the law relating to lunacy generally and its history we have become profoundly impressed with the great need for its overhauling by the Legislature to cure the many ambiguities, inconsistencies, and uncertainties with which it is infected. We earnestly hope that the law-making body will soon mould an act on the subject which will furnish a guide for future decisions affecting the insane, their estates, and the obligations those estates should bear in order that even more attention may be received.by those so unfortunate as to be both insane and indigent, carrying out the thought expressed in Sec. 4, Chapter 3115, and Sec. 394.12, supra, that “any moneys recovered in any * * * action [for the care of pay patients] shall be always applied to the maintenance of indigent patients.” The judges who enforce the law and the Board charged with administering the affairs of the Hospital should have less foggy beacons to light their course.
.This opinion should be read in conjunction with the one in Warren v. Pope, Fla., 64 So.2d 564.
Affirmed.
ROBERTS, C. J., and HOBSON and DREW, JJ., concur.